IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs October 3, 2017

**STATE OF TENNESSEE v. JUSTUS ONYIEGO**

**Appeal from the Criminal Court for Shelby County**
**No. 15-00352     Glenn Ivy Wright, Judge**

_____

**No. W2017-00217-CCA-R3-CD**

_____

A Shelby County Criminal Court Jury convicted the Appellant, Justus Onyiego, of two counts of aggravated rape, a Class A felony. After a sentencing hearing, the trial court merged the convictions and sentenced him to seventeen years in confinement. On appeal, the Appellant contends that the trial court denied his right to due process by failing to dismiss the indictment due to the State's ten-year preindictment delay, that the trial court erred by failing to strike the testimony of two police officers, that the trial court erred by refusing to admit evidence of the victim's prior sexual behavior under Tennessee Rule of Evidence 412, and that a prosecutor's failure to correct false statements during closing arguments violated Napue v. Illinois, 360 U.S. 264 (1959), and constituted prosecutorial misconduct. Based upon the record and the parties' briefs, we find no reversible error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and Alan E. Glenn, JJ., joined.

Claiborne H. Ferguson (on appeal) and Shannon McKenna (at trial), Memphis, Tennessee, for the appellant, Justus Onyiego.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Abby Wallace, and Samuel Winnig, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

In January 2015, the Shelby County Grand Jury indicted the Appellant for two counts of aggravated rape based upon alternative theories. The indictment alleged the rapes occurred in September 2004, and the Appellant's jury trial began on June 1, 2016. Although the Appellant does not contest the sufficiency of the evidence, we will summarize the evidence presented at trial.

The thirty-seven-year-old victim testified that in September 2004, she lived in an apartment in Memphis with her mother, sister, and children. On the morning of Sunday, September 5, the victim was sitting on the steps outside her apartment and noticed that a four-door, green car kept driving by the apartment. At some point, the car stopped, and the driver, whom the victim identified at trial as the Appellant, asked if she knew where he could buy some powder cocaine. The victim had seen the Appellant in the neighborhood previously and "kind of recognized who he was" but did not know his name. The victim told the Appellant that she did not know where he could buy cocaine, and he told her that "I was really trying to see could I date you, get with you." The victim knew he was talking about prostitution. The victim asked how much money he had, and he asked what he could get for forty dollars. The victim told him "[m]aybe both," meaning oral and vaginal sex. The victim wanted money to buy drugs, so she got into the Appellant's car.

The victim testified that the Appellant claimed he knew "a good spot" and that he pulled onto a ramp at a warehouse where trucks loaded and unloaded. The victim was scared someone would see them and told him she did not like that location. She also told him she wanted the money first. The Appellant told the victim, "I ain't got no change. I give it to you afterwards." The victim said she responded, "You ain't got no change? But we just passed by the store." The Appellant then told the victim, "I'm going to give it to you, I'm going to give it to you." The victim told the Appellant, "Man, no, that's okay. I want to go home." The Appellant acted as if he did not want to take to the victim home, so the victim opened the door to get out of the car. The Appellant grabbed her hair and pulled her back inside the car. The victim turned around and started hitting the Appellant, and they began "fighting and tussling." The victim said that the car was constantly moving on the ramp while they were fighting and that "the front two wheels went over the ramp and [the car] got stuck." The Appellant began choking the victim and put a knife to her throat, and the victim passed out. She said that when she awoke, the Appellant's penis was inside her vagina, and he was having sex with her. She saw a screwdriver in the car, grabbed it, and started "sticking him with it." She got out of the car and ran to a gas station.

The victim testified that when the police came to the gas station, she told them that a man had raped her and that his car was stuck on a ramp at a warehouse. The police went to the warehouse and brought the Appellant to the gas station, where the victim

- 2 -

identified him as her attacker. The victim went to the Rape Crisis Center and spoke with a nurse. She told the police and the nurse that the Appellant used a knife during the attack but did not tell them that she was working as a prostitute that day. The victim identified photographs of scratches and cuts on her neck and the Appellant's car stuck on the ramp for the jury.

The victim testified that she was scared to cooperate with the police because the Appellant knew where she lived and that she did not have any further contact with law enforcement after September 5, 2004. Years later, though, a police officer contacted her, and she told him about what happened in September 2004. The officer showed the victim a six-photograph array, and she selected the Appellant's photograph. The victim acknowledged that she originally agreed to have sex with the Appellant but that she changed her mind because she did not like the location he chose and because he did not have any money.

On cross-examination, the victim denied telling the police that she was walking home after a night of partying and smoking crack cocaine when the Appellant stopped his car to talk with her. She acknowledged that she did not tell the police she was prostituting herself on September 5 and that she may have told them she was raped at gunpoint. She also acknowledged that she was addicted to crack cocaine at the time of the incident, that she agreed to get into the Appellant's car, and that she agreed to have sex with him for money. However, he would not give her the money prior to the sex, so she changed her mind and told him no. She testified that they started "fight and tussling" and that she began "sticking" him with the screwdriver. She acknowledged that she broke his glasses and that she may have "bust[ed]" his lip.

Lieutenant Mark Wojcicki of the Memphis Police Department (MPD) testified that about 7:30 a.m. on September 5, 2004, he was dispatched to the Tiger Mart Exxon on the corner of Third and Crump and was the first officer on the scene. The victim was "very frantic," had been "beat up really bad," and told Lieutenant Wojcicki that "she asked a dude for a ride and he pulled around some building, and then hit her with something and tried to force her to have sex with him." The officer said that the victim's clothes were torn and that "[y]ou could see all of her bra." He identified photographs of the victim taken at the gas station and said the photographs showed "ligature marks around her neck and just redness and bruising." Lieutenant Wojcicki left the gas station, went "down the street," and saw a car "halfway off" a loading dock. He saw the Appellant walking toward the Tiger Mart Exxon, and the Appellant matched the description given by the victim. Lieutenant Wojcicki transported the Appellant to the gas station, and the victim shouted, "That's him, that's him."

- 3 -

On cross-examination, Lieutenant Wojcicki acknowledged that the victim claimed that she had been walking home "after a night of partying, smoking crack"; that the Appellant stopped his car and asked if she wanted a ride home; and that he raped her at gunpoint. Lieutenant Wojcicki said he did not find any weapons on the Appellant.

Officer William Goetsch of the MPD testified that he responded to the Tiger Mart Exxon on September 5, 2004. The Appellant was in custody when he arrived, and the victim said the Appellant raped her. The victim claimed the Appellant used a gun "to traumatize or to hold her at bay while [the] rape had occurred." Officer Goetsch said the victim was "battered," had injuries to her neck, and "was very sincere and genuine in how she spoke about that she had just been raped." Defense counsel asked if the victim admitted to Officer Goetsch that she had been working as a prostitute that day, and he answered, "I believe so." On cross-examination, though, Officer Goetsch acknowledged that he wrote the police report for this case and that he did not mention the victim's working as a prostitute in the report. He explained that he would not have included information in the report that was not relevant to the case.

Sergeant Lavern Jones of the MPD testified that he went to the Tiger Mart Exxon and photographed the victim. He then went to the warehouse on Crump and photographed a car "hanging off the dock." A cellular telephone and a condom were on the driver's side floorboard inside the car, and clothing, including a pair of men's boxer shorts, was on the backseat. Sergeant Jones said that the police found some of the Appellant's personal property, including his wallet, inside the car and that a condom wrapper was on the ground outside the car.

Kristine Gable, the Nursing Coordinator for the Rape Crisis Center, testified as an expert in forensic sexual assault examination that a nurse examined the victim at 9:30 a.m. on September 5, 2004, and that she had reviewed the nurse's report. The victim was twenty-five years old and reported that she had been raped at 6:30 a.m. The nurse described the victim as "agitated, cooperative, sobbing, and tearful," and the victim told the nurse the following: The victim had been walking home when the Appellant pulled up beside her and asked if she needed a ride. The victim got into the car, the Appellant parked between two trailer trucks, and the victim tried to get out of the car. The Appellant hit the victim on the head with a gun, choked her, tore off her panties, and raped her. According to the nurse's report, the Appellant vaginally penetrated the victim one time, ejaculated, and did not use a condom.

Ms. Gable testified that the nurse collected vaginal swabs and slides for a rape kit and that the nurse did not see any vaginal or anal injuries. However, the nurse reported redness and three lacerations to the victim's neck and swelling and redness to the victim's left eye. The victim complained of a headache and abdominal pain.

Sergeant Israel Taylor of the MPD testified that he used to work as an investigator for the MPD's DNA Unit and was responsible for investigating "old" rape and sexual assault cases. In October 2014, Sergeant Taylor received and began investigating the victim's case, which had been closed by the original investigator because the investigator could not locate the victim. Sergeant Taylor stated, "The original investigators made several attempts to try and locate her, relative's houses, phone numbers, and it was just everything was a dead end, basically, for lack of a better term." As a result, the police released the Appellant from custody.

Sergeant Taylor testified that he contacted the victim, that she agreed to cooperate, and that he took a formal statement from her in December 2014. He said the victim "was just a range of emotions when we met with her: part relief, part anger, part sadness." He showed her a six-photograph array, and she "eventually" selected the Appellant's photograph. The victim told Sergeant Taylor that she was "positive" the Appellant was the perpetrator. The grand jury indicted the Appellant, and the police arrested him and collected a buccal swab from him.

Jennifer Millsaps of the Tennessee Bureau of Investigation's Serology and DNA Unit testified as an expert in forensic DNA analysis that in June 2011, she analyzed the swabs and slides in the victim's rape kit and found sperm. In January 2015, she received a "standard" from the Appellant and compared the DNA from the Appellant's sample to the sperm DNA. The DNA profiles matched. On cross-examination, Agent Millsaps acknowledged that the match did not mean a rape occurred.

At the conclusion of Agent Millsaps's testimony, the State rested its case. The Appellant did not present any proof, and the jury convicted him as charged of one count of aggravated rape accomplished by the use of force or coercion and while armed with a weapon and one count of aggravated rape causing bodily injury to the victim. After a sentencing hearing, the trial court merged the convictions and sentenced the Appellant to seventeen years in confinement.

## II. Analysis

### A. Preindictment Delay

The Appellant contends that the trial court denied his right to due process by failing to dismiss the indictment due to the State's ten-year preindictment delay. The State argues that the trial court properly refused to dismiss the indictment. We agree with the State.

Although the crimes occurred in September 2004, the Shelby County Grand Jury did not indict the Appellant until January 2015. On June 25, 2015, the Appellant filed a motion to dismiss the indictment based on violations of both federal and state due process. The Appellant argued in the motion that he had been prejudiced by the delay because material witnesses had not been located and because the memories of witnesses had "faded over time."

The trial court held a hearing on the motion on September 24, 2015. No witnesses testified at the hearing, and neither party presented any evidence. During the hearing, defense counsel advised the trial court that she could not yet show actual prejudice to the Appellant due to the delay "other than what you would expect to find in a case that has been delayed for nearly 15 years in prosecuting and finding the witnesses." Nevertheless, she argued that the trial court should dismiss the indictment due to the State's "reckless disregard" for testing the victim's rape kit, which caused the State's unjustifiable delay in indicting the Appellant. Defense counsel also argued that the trial court should consider the balancing approach adopted in State v. Ferguson, 2 S.W.3d 912, 915-18 (1999), a case involving evidence lost by the State, for the last prong of the Marion-Dykes test, the test used to determine whether a preindictment delay infringes upon a defendant's due process rights. Defense counsel explained, "We're not arguing that this is lost evidence; however, it might as well have been for all practical purposes."

The State explained that the reason for the delay was as follows: When the police went to talk with the victim soon after the rape, they were unable to locate her because she had checked herself into a rehabilitation center. The police left their information for the victim, but she never contacted them. The State argued that while the police's inaction in pursuing the case may have been due to "indifference" or "incompetence," the delay was not to gain a tactical advantage for the State. The State noted that the Appellant had offered no proof that the State intentionally caused the delay in order to gain a tactical advantage. The State also argued that due to the Appellant's inability to show actual prejudice, the trial court should deny the motion to dismiss. Defense counsel responded that according to the notes from the original investigation, a police officer went to speak with the victim on September 20, 2004. The victim was not there, so the officer closed the case just sixteen days after the alleged attack due to the victim's lack of cooperation.

The trial court found that a preindictment delay existed. However, the court also found that the Appellant failed to prove the State caused the delay in order to gain a tactical advantage over him and that the Appellant failed to prove actual prejudice. Thus, the court denied the motion. On appeal, the Appellant contends that the dispositive issue before us is whether the State caused the delay in order to gain a tactical advantage and

that the balancing approach adopted in Ferguson more equitably distributes the burden of proof between a defendant and the State.

We review a trial court's ruling on a motion to dismiss the indictment for an abuse of discretion. State v. Harris, 33 S.W.3d 767, 769-70 (Tenn. 2000). Generally, to establish a due process violation stemming from a preindictment delay, an accused must prove the following prerequisites, also known as the Marion-Dykes test: (1) there was a delay; (2) the accused sustained actual prejudice as a direct and proximate result of the delay; and (3) the State caused the delay in order to gain a tactical advantage over the accused or to harass the accused. State v. Utley, 956 S.W.2d 489, 495 (Tenn. 1997) (citing United States v. Marion, 404 U.S. 307, 324-25 (1971), and State v. Gray, 917 S.W.2d 668, 671 (Tenn. 1996)); see also State v. Carico, 968 S.W.2d 280, 284-85 (Tenn. 1998).

In Ferguson, our supreme court addressed the issue of when a defendant is entitled to relief in the event the State has lost or destroyed evidence that was alleged to have been exculpatory. 2 S.W.3d at 915-18. The court explained that a reviewing court must first determine whether the State had a duty to preserve the lost or destroyed evidence. Id. at 917. Ordinarily, "the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id.

If the proof demonstrates the existence of a duty to preserve the evidence and further shows that the State has failed in that duty, a court must proceed with a balancing analysis involving consideration of the following factors:

> 1. The degree of negligence involved;
>
> 2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
>
> 3. The sufficiency of the other evidence used at trial to support the conviction.

Id. (footnote omitted). If the court's consideration of these factors reveals that a trial without the missing evidence would lack fundamental fairness, the court may consider several options such as dismissing the charges or providing an appropriate jury instruction. Id.

The Appellant contends that in State v. Ahmad R. Manning, No. E2011-01812-CCA-R3-CD, 2013 WL 794154 (Tenn. Crim. App. at Knoxville, Mar. 4, 2013), perm.

app. denied, (Tenn. Sept. 11, 2013), this court "incorporated the aforementioned Ferguson approach as a method of ensuring that the due process right to a fair trial was not infringed." We disagree with the Appellant. In Ahmad R. Manning, the trial court dismissed the indictment because the two-year delay between the offenses and the indictment gave the State an "[a]lbeit unintentional" advantage over the defense. No. E2011-01812-CCA-R3-CD, 2013 WL 794154, at *4. On appeal, this court concluded that the trial court erred by dismissing the indictment under the Marion-Dykes test because "the trial court must find that the State intentionally delayed the proceedings in order to gain a tactical advantage or to harass the accused." Id. at *5 (emphasis added). Accordingly, this court reversed the trial court's dismissal of the indictment. See id. This court expressed concern, though, as to "whether in reality the Marion-Dykes rule affords a defendant meaningful protection of his due process right to a fair trial in the face of unreasonable and unjustified pre-indictment delay" and suggested a "Ferguson-type analysis" for such cases. Id. at *6. However, this court did not incorporate Ferguson into its own analysis of the issue, and our supreme court denied the defendant's application for permission to appeal. Id. at *7.

Turning to the instant case, the trial court found that the Appellant did not prove he sustained actual prejudice as a direct and proximate result of the delay or that the State caused the delay in order to gain a tactical advantage over him. The Appellant offered no evidence at the hearing on the motion to dismiss and offers no evidence on appeal that the State intentionally caused the delay in order to gain a tactical advantage. Moreover, the Appellant acknowledged at the hearing that he could not show actual prejudice, and he does not address actual prejudice on appeal. Therefore, we conclude that the trial court did not abuse its discretion by refusing to dismiss the indictment.

B. Police Officers' Testimony

Next, the Appellant contends that the trial court erred by refusing to strike Officer Goetsch's testimony due to his lack of memory and by overruling the Appellant's objection to Sergeant Taylor's testimony about cold-case victims' emotions. The State argues that the trial court properly admitted the officers' testimony. We conclude that the Appellant is not entitled to relief.

Officer Goetsch testified on direct examination that he went to the Tiger Mart Exxon on September 5, 2004, and that he wrote the offense report for this case. He said that he did not remember speaking with the victim but that he was "sure" he did so and that he thought he transported her to the Rape Crisis Center. The State showed him a photograph of the victim taken on the day of the crimes, and he stated, "And by looking at that photograph, I recall a lot of -- this young lady had mentioned that she had been victimized and raped." Officer Goetsch said that the victim claimed the Appellant used a

gun during the rape but that he did not remember if the police recovered a gun from the Appellant. He also did not remember if the victim told him that she had been working as a prostitute that day.

On cross-examination, defense counsel asked Officer Goetsch if he remembered the victim's telling him that she had been walking home from a night of partying and smoking crack cocaine when the Appellant approached her. Officer Goetsch replied, "If that's in my report, I wrote it." Defense counsel asked the officer if he had any independent recollection of what the victim told him, and he answered, "I made the scene at that Exxon, or Tiger Mart at that time. She was the victim of a crime, I do remember that. And there was a rape involved. So, yes, I do have independent recollection." Defense counsel asked if he remembered responding to the Exxon for a "fight call," not a rape, and he said no. Defense counsel then asked, "You don't have very much independent recollection of this, correct?" The officer answered, "I thought I gave . . . what my recollection was." He said that he reviewed his offense report the day before the trial and that he thought he remembered writing what the victim told him in his report. At that point, defense counsel requested that the trial court strike Officer Goetsch's testimony, and the State responded, "He has testified to what he remembered when he saw the picture. He said he remembered that very clearly. . . . Obviously, because it's been 12 years, some of the people have lost some of their memory. I believe it is clear what he remembers and what he's seen from his report." The trial court refused to strike the officer's testimony.

On direct examination, Sergeant Taylor testified that when he contacted the victim in 2014,

> it was just a range of emotions when we met with her: part relief, part anger, part sadness. I mean, she was just -- I mean, we went to this woman, talked to her about what happened to her several years later and it's like we brought it all up again. As you can imagine, the emotions were just high.

Later, the State asked him to describe his procedure for reestablishing contact with victims in "cold" cases, and he answered, "We take a counselor or victim advocate from the Rape Crisis Center that goes with us. And the reason for that, as you can imagine, all just runs the gamut of emotions[.]" Defense counsel objected and requested that Sergeant Taylor "talk about this case." However, the trial court overruled the objection, stating, "He can testify to generally what their policies are[.]"

The Appellant first contends that the trial court erred by refusing to strike Officer Goetsch's testimony for his lack of memory about the events on September 5, 2004. We disagree. As noted by the State, every person is presumed to be competent to testify and may testify if evidence is introduced to show that the witness has personal knowledge of the matter. Tenn. R. Evid. 601, 602. The competency of a witness is a matter entrusted to the sound discretion of the trial judge, who has the opportunity to observe the witness firsthand. State v. Caughron, 855 S.W.2d 526, 537-538 (Tenn. 1993). Here, Officer Goetcsh testified that he wrote the incident report for this case. Although he did not have an independent recollection of speaking with the victim, he was sure he did so. At that point, the State refreshed his memory by showing him a photograph taken of the victim on the day of the crimes. The officer also stated that he had refreshed his memory before trial by reviewing his offense report. Defense counsel thoroughly questioned Officer Goetsch about his memory of the events. Although Officer Goetsch may not have had a perfect memory regarding September 5, 2004, we cannot say that the trial court abused its discretion by refusing to strike his testimony.

As to Sergeant Taylor, the State notes that the Appellant did not object to the officer's testimony regarding the victim's emotions. Therefore, the issue is waived. See Tenn. R. App. P. 36(b). As to Sergeant Taylor's general statements about cold-case victims experiencing a "gamut of emotions," we question the relevancy of that testimony to this case. See Tenn. R. Evid. 401; State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995) (stating that the determination of relevant evidence is left to the discretion of the trial court). In any event, Sergeant Taylor's statements were brief, and the State's proof was strong. Therefore, we conclude that even if the trial court erred by admitting Sergeant Taylor's statements, the error was harmless. See Tenn. R. App. P. 36(b).

C. Tennessee Rule of Evidence 412

The Appellant claims that the trial court erred by refusing to admit evidence of the victim's prior sexual behavior under Tennessee Rule of Evidence 412. The State argues that the trial court properly excluded the evidence. We agree with the State.

Before trial, the Appellant filed a motion to admit evidence of the victim's prior sexual behavior as a prostitute under Rule 412. The Appellant argued in the motion that he should be allowed to show the victim "engaged in a distinctive pattern of flagging men down to engage in sex for money . . . even after she was allegedly raped [by the Appellant]," which was relevant to attack the victim's credibility and support his defense of consent.

At a hearing on the motion, the victim testified for the Appellant that she worked as a prostitute from 2002 to 2010. She said she did not know how many times the police

- 10 -

arrested her for prostitution during that time, but she acknowledged that "[i]t was a lot." She also acknowledged that she pled guilty to prostitution "a number of times." She denied that all of her arrests resulted from her flagging down customers. She also denied flagging down an undercover police officer for sex in 2002 but acknowledged pleading guilty to a charge of prostitution in which an officer alleged she did so. She also acknowledged pleading guilty to several additional charges of prostitution in which police officers claimed she flagged down their vehicles. On cross-examination by the State, the victim acknowledged having numerous convictions for prostitution but said that the Appellant was the only customer she ever accused of rape. The trial court ruled that the evidence did not satisfy Tennessee Rule of Evidence 412 and denied the Appellant's motion.

Tennessee Rule of Evidence 412 addresses the issue of whether evidence of a victim's prior sexual behavior is admissible and the procedure to determine when such information should be allowed into evidence. Usually, evidence of specific instances of a victim's sexual behavior is inadmissible. However, evidence of a victim's sexual behavior with persons other than the accused is admissible to prove consent if the evidence concerns a pattern of sexual behavior so distinctive and so closely resembling the accused's version of events that it tends to prove the victim consented or behaved in such a manner as to lead the defendant to reasonably believe the victim consented. Tenn. R. Evid. 412(c)(4)(iii). The admissibility of evidence under Tennessee Rule of Evidence 412 rests in the trial court's discretion. State v. Sheline, 955 S.W.2d 42, 46 (Tenn. 1997).

Turning to the instant case, we agree with the trial court that evidence of the victim's prostitution does not fall under the purview of Rule 412(c)(4)(iii). "The plain language of the rule speaks of 'specific instances' of sexual conduct with 'persons' other than the defendant." State v. Sheline, 955 S.W.2d 42, 46 (Tenn. 1997). As our supreme court explained, "[T]he pattern [must] consist of sexual behavior so distinctive and so closely resembling the defendant's version that it tends to prove that the victim consented to the act charged. The advisory comments to Rule 412 use the word 'signature' cases to describe the distinctive behavior required." Id. The victim acknowledged that she worked as a prostitute and that she pled guilty to charges of prostitution in which undercover police officers alleged she flagged down vehicles. However, the Appellant failed to offer any distinctive pattern of sexual behavior by the victim to support his claim that their entire sexual encounter was consensual. Thus, the trial court did not abuse its discretion by ruling that the evidence was inadmissible.

D. Closing Arguments

Finally, the Appellant contends that one of the State's prosecutors violated Napue v. Illinois, 360 U.S. 264 (1959), and committed prosecutorial misconduct by telling the

jury several times during closing arguments that the Appellant did not have any money on the day of the crimes. He asserts that the prosecutor's statements were "patently false" because the proof showed that he had at least twenty dollars in his wallet when he was arrested and were "clearly aimed at leading the jury to infer that Mr. Onyiego could not have intended to engage in a consensual encounter because he did not have the funds to follow through with the agreement." The Appellant acknowledges that defense counsel failed to object to the prosecutor's statements but contends that the statements rise to the level of plain error. The State argues that the Appellant is not entitled to relief. We agree with the State.

During closing argument, one of the prosecutors stated as follows:

> [The victim] told you she wanted to go home. She didn't want to do that there. She was worried that they would get caught. She didn't want to catch a charge. But she told you she wanted her $40, too. She told you, Should have followed my gut. Against her better judgment, she was like, Fine, give me my money, let's do this.
>
> He didn't have any money. I'll give it to you later. I'll give it to you after.
>
> . . . .
>
> So what evidence did you hear of force or coercion and the use of a weapon? Well, [the victim] told you she wanted to leave. She had that right. She agreed to have sex for $40. She wanted to go to one location. He told her, If you don't like it, we'll leave. They got there, she didn't like it, he didn't leave. And then he didn't have the money.
>
> . . . .
>
> And when she said, Well, how much money do you have? And he said $40, what can I get for $40. And she told him. They made an agreement. He made that agreement with her in front of her house on McLemore, knowing he didn't have a dime to his name.

At the motion for new trial hearing, defense counsel advised the trial court that according to the MPD's Crime Scene Narrative form, the MPD's Property Release form, and

MPD's Evidence Permanent Assignment Receipt form, the Appellant's wallet contained one twenty-dollar-bill at the time of his arrest. Defense counsel argued that although the State did not introduce the forms into evidence at trial, the State provided the forms during discovery; therefore, the prosecutor's claim that the Appellant did not have any money was "not correct."

Because the Appellant did not object to the prosecutor's statements, the issue is waived. See Tenn. R. App. P. 36(a) (nothing in the rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error). However, we may consider an issue as plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also Tenn. R. App. P. 36(b). Furthermore, the "'"plain error" must be of such a great magnitude that it probably changed the outcome of the trial.'" Id. at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)). It is the Appellant's burden to demonstrate plain error. State v. Gomez, 239 S.W.3d 722, 727 (Tenn. 2007). Moreover, we do not need to consider all five factors if we determine that a single factor does not warrant relief. State v. Smith, 24, S.W.3d 274, 283 (Tenn. 2000).

First, the Appellant argues that the prosecutor's false statements violated Napue, in which the United States Supreme Court held that "a conviction obtained through the use of false evidence, known to be such by representatives of the State," deprives a defendant of due process. 360 U.S. at 269; see State v. Spurlock, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). "The same result occurs when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue, 360 U.S. at 269. To prevail on a claim that the State knowingly presented false testimony, a defendant must establish by a preponderance of the evidence "(a) that false or perjured testimony was admitted at trial, (b) that the state either knowingly used such testimony or knowingly allowed it to go uncorrected, and (c) that the testimony was material and deprived him of a fair trial." Roger Morris Bell v. State, No. 03C01-9210-CR-00364, 1995 WL 113420, at *8 (Tenn. Crim. App. at Knoxville, Mar. 15, 1995).

The Appellant argues that the prosecutor knowingly made false statements during closing arguments, not that the prosecutor knowingly presented false testimony or evidence as required by Napue. "Closing arguments are not evidence." State v. Gentry, 538 S.W.3d 413, 430 (Tenn. 2017). Thus, the Appellant is not entitled to relief, let alone plain error relief, under Napue.

The Appellant also contends that the prosecutor's statements constitute prosecutorial misconduct. In order to prevail on a claim of prosecutorial misconduct, the Appellant must demonstrate that the conduct committed by the prosecution was so inflammatory or improper that it affected the verdict to his detriment. Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965); State v. Gray, 960 S.W.2d 598, 609 (Tenn. Crim. App. 1997). In making this determination, this court is guided by five factors:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2. The curative measures undertaken by the court and the prosecution.
>
> 3. The intent of the prosecutor in making the improper statement.
>
> 4. The cumulative effect of the improper conduct and any other errors in the record.
>
> 5. The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984). We note that "the Judge factors should only be applied to claims of improper prosecutorial argument," as in this case, not claims of unconstitutional prosecutorial comment. State v. Jackson, 444 S.W.3d 554, 591 n.50 (Tenn. 2014). "[T]he State bears the burden of proving unconstitutional prosecutorial comment or argument harmless beyond a reasonable doubt, whereas a defendant bears the burden of proving prejudice when prosecutorial argument is merely improper." Id.

Regarding prosecutorial misconduct during closing arguments, it is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being

- 14 -

tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

In Goltz, 111 S.W.3d at 6, this court outlined "five general areas of prosecutorial misconduct" that can occur during closing argument: (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge. "In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996).

Here, no evidence was presented at trial as to whether the Appellant possessed any money when he picked up the victim. However, the victim testified that the Appellant refused to give her any money before they had sex. As a result, the victim logically concluded that he did not have any money. Therefore, we cannot say that the prosecutor intentionally misled the jury or misstated the evidence.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE